FILED

UNITED STATES DISTRICT COURT
FOR THE
EASTERN DISTRICT OF VIRGINIA

2013 OCT 23 P 4: 04

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

COMPUTER FRONTIERS INC., Plaintiff )
)
)
v. )
)   Civil Action No.  1:13CV1331 -GBL TCB
CGI GROUP INC., Defendant )
CGI FEDERAL INC., Defendant )
STANLEY ASSOCIATES, INC., Defendant )
STANLEY, INC., Defendant )
)

## COMPLAINT

Plaintiff, COMPUTER FRONTIERS, INC., by and through counsel, hereby brings this action against Defendants, CGI GROUP INC., CGI FEDERAL INC., STANLEY ASSOCIATES, INC. and STANLEY INC., and alleges as follows:

## NATURE OF THE CASE

1.       In early 2010, Plaintiff Computer Frontiers, Inc. ("CFI" or "Computer Frontiers") teamed with Defendant Stanley Associates, Inc. ("Stanley") to compete for and win a Prime Contract from the Department of State to provide visa processing services worldwide as part of the State Department's Global Support Strategy Program ("GSS"). The Prime Contract is a ten-year vehicle with a maximum value of approximately $2.8 billion.

2.       Computer Frontiers worked closely with Stanley to develop and submit a competitive proposal which relied heavily on CFI's extensive expertise and broad experience in providing visa processing services abroad as well as CFI's status as both a Small Disadvantaged Business and as a Woman-Owned Small Business. As a result, Stanley was awarded the GSS Prime Contract.

3.       Shortly after the Stanley team won the Prime Contract, Stanley was acquired by a Canadian corporation, CGI Group Inc. Securing the Prime contract significantly increased Stanley's value, and hence the value CGI added through the acquisition. Upon being acquired by CGI Group Inc., Stanley Associates, Inc. became a wholly-owned subsidiary of CGI Federal, known as Stanley, Inc. (hereinafter collectively "CGI" or "Defendants").

4.     In exchange for CFI's contribution to the proposal process, which assistance resulted in the award of the Prime Contract, the parties entered into a Subcontract in which they bargained for and agreed that Computer Frontiers would receive work-share in an amount equal to at least nine (9%) percent of the gross revenues under the Prime Contract—or $252 million, should CGI receive the entire $2.8 billion value of the Prime Contract. After the award of the Prime Contract, CGI entered into a Department of State sanctioned Mentor-Protégé relationship with Computer Frontiers. CGI then used that relationship, as well as continuing to use CFI's qualifications and small business status, to enhance its ability to win additional GSS work through Task Orders under the Prime Contract.

5.     Notwithstanding the terms of the Subcontract, CGI has withheld the agreed-upon work-share from Computer Frontiers, instead awarding nearly all of the promised work to large foreign multinational corporations. After benefiting from CFI's expertise, its small business status with the U. S. Small Business Administration and its contributions in winning the Prime Contract and subsequent labors under various Task Orders, CGI continues to disregard the terms of the Subcontract.

6.     Computer Frontiers brings this action to enforce its rights under the Subcontract on a going forward basis, and to recover damages for CGI's fraudulent actions as well as its breach of its obligation to provide the agreed-upon 9% work-share of gross revenues under the Prime Contract. Without enforcement of the terms of the Subcontract, which CGI has heretofore ignored and interrupted with impunity, Computer Frontiers will be unable to actively fulfill its contractual obligations under the Subcontract in the coordinated and reliable manner it bargained for.

## THE PARTIES

7.     Computer Frontiers, Inc. is a Maryland corporation with its principal place of business located at 5970 Frederick Crossing Lane, Frederick, Maryland 21704.

8.     CGI Group, Inc. is a Canadian corporation, with its Virginia office located at 12601 Fair Lakes Circle, Fairfax, Virginia 22033.

9.     CGI Federal, Inc. is a Canadian corporation, with its Virginia office located at 12601 Fair Lakes Circle, Fairfax, Virginia 22033.

10.     Stanley Associates, Inc. is a Virginia corporation with its principal place of business located at 12601 Fair Lakes Circle, Fairfax, Virginia 22033.

11.     Stanley, Inc. is a Virginia corporation with its principal place of business located at 12601 Fair Lakes Circle, Fairfax, Virginia 22033.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U. S. C. § 1332 as the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

13.     Venue is proper in this Court pursuant to 28 U. S. C. §1391, in that a substantial part of the acts and omissions giving rise to the causes of action stated herein arose in this district.

## FACTUAL ALLEGATIONS

**A.     Parties to the Subcontract**

14.     Plaintiff Computer Frontiers, Inc. is a Woman-Owned Small Business, established in 1996.  Through June of 2013, Computer Frontiers was certified as a Small Disadvantaged Business with the U. S. Small Business Administration.  In more than 40 countries around the world, Computer Frontiers specializes in providing private and government clients with information, business and project management solutions.  With respect to Travel Visa Services, Computer Frontiers was instrumental in the transition from consulate paper processes to an online application process by virtue of its focus on both electronic and customer-focused solutions, which provide CFI's clients with the highest level of connectivity and oversight by client line Ministries.  CFI's visa service capabilities include most services required under the Prime Contract at issue in this case.  In providing these services, Computer Frontiers employs the strengths of local experts, industry best practices and new technologies.

15.     Defendant Stanley Associates, Inc. ("Stanley") is a consulting firm that provides information technology ("IT") services to United States defense, intelligence, and federal civilian government agencies.  Stanley made its initial public offering on the NYSE in October of 2006.

16.     Defendant CGI Group, Inc., a Canadian-based company, is one of the largest independent information technology business process service firms in the world.  In the mid-

1990's CGI adopted a "build and buy" growth strategy, which allowed for the acquisition of U. S. based Stanley Associates Inc. and Anglo-Dutch firm Logica, to name a few. CGI and its affiliated companies employ approximately 26,000 professionals and have a presence in more than 40 countries. The services that CGI provides from offices in the North America, Europe, India and Asia include IT consulting, systems integration, application development and management, infrastructure services, and business process services.

17.     Stanley Associates Inc. was acquired by the CGI Group Inc., effective August 17, 2010 and became a wholly owned subsidiary of CGI Federal Inc., called Stanley Inc. (collectively, "Defendants").

18.     CGI's acquisition of Stanley was an integral part of its plan to profitably double its own size in three to five years through a combination of acquisitions and organic growth. As a result of this acquisition, CGI joined the ranks of U. S. federal IT contractors with more than $1 billion in revenue. The acquisition of Stanley was intended to bring additional scale to CGI's U. S. operations by combining Stanley's defense and civilian IT and business process outsourcing services with CGI's end-to-end capabilities, mission-critical solutions, and strong client relationships along with the newly acquired ten-year Department of State contract with approximate total value of $2.8 billion. The combination increased CGI's position across the entire U. S. Federal Government by bringing additional scale to CGI's U. S. operations, accounting for nearly half of CGI's global revenue. To date, Stanley remains a wholly-owned subsidiary of CGI.

19.     While none of the Defendants boasts presence in Africa, Computer Frontiers actually gained its expertise through over seventeen years of business experience and eight years of specific visa services experience, in Africa.

20.     Not presently a party to this action, VFS Global ("VFS") has a separate subcontract agreement with CGI under the Prime Contract at issue in this case. Originally founded in India, and currently managed from its headquarters in Mumbai, India with revenue in excess of $195 million, VFS is currently a wholly-owned subsidiary of Kuoni Group, a public-listed company headquartered in Zurich, Switzerland. VFS provides information services (call centers), web-based modules (for appointment scheduling and online payment collection), biometrics (data capture and transfer), verification/legalization/attestation, translation, overseas citizenship, logistics solutions, program and project management, database management, security

solutions, financial solutions, etc. to several government clients, and assists them in redistributing their visa and passport applications processes to one of VFS' various Visa Application Centers.

**B.**    **Securing the GSS Prime Contract**

21.    The U. S. Department of State supports consular offices and missions overseas in providing national citizens of each country with information on how to apply for individual visas needed to visit the United States.

22.    After years of teaming with Computer Sciences Corporation ("CSC") (one of the world's leading consulting and information technology services firms), and having established visa processing locations in Senegal, South Africa, and Togo, Computer Frontiers possesses particular expertise in the visa processing process. This expertise is largely attributable to CFI's experience providing project plans for launching visa processing services in Africa, refining customer service operations, and providing services specific to geographic locations. Moreover, Computer Frontiers is uniquely positioned as the only small business with this breadth of expertise and experience.

23.    In or around 2008, as the time for the Department of State to seek a new contract for visa processing services grew near, Computer Frontiers developed an approach to continue to operate in the market space. In order for Computer Frontiers to benefit from a small business set-aside, at least three small businesses needed to possess the capabilities that Computer Frontiers had developed over time. But, the only small business with adequate capabilities was Computer Frontiers. At the same time, Computer Frontiers was unable to be competitive as a prime contractor in this large acquisition. The only option available to Computer Frontiers was to partner with a larger entity that could operate within this specialized market space.

24.    Very few companies qualify to operate in the specialized market space of providing visa processing services abroad. Although Stanley had little overseas experience, it had experience processing passports and working with the Department of State. Because it believed that its interests were aligned with the interests of Stanley, Computer Frontiers entered into a Teaming Agreement with Stanley. The agreement provided: "Stanley will also utilize it's [sic] best efforts to ensure that opportunities for staffing [Global Support Strategy] task orders are geared to meeting State's small business goals and objectives for all offered positions." *See*

Stanley-CFI Teaming Agreement #: TA-1945-10-CFI-GSS, attached as Exhibit 2 ("Teaming Agreement").

25.     Notwithstanding a 2007 report by the U. S. Government Accountability Office on passport and visa security outlining the potential dangers of outsourcing passport functions to contractors like Stanley, and 2008 Department of State reports that 2 employees of a Stanley subcontractor had improperly accessed the passport application file of then-Senator Barak Obama, Stanley found itself competitive in the bidding process for a large contract with the Department of State in 2009.

26.     During the bidding process for the GSS Prime Contract, Stanley was required to create a Small Business Plan.  The contents and quality of the Small Business Plan were among the criterion to be evaluated in awarding the contract.

27.     Throughout the competitive process for the GSS Prime Contract and until June of 2013, Computer Frontiers was self-represented as a Small Disadvantaged Business with the U. S. Small Business Administration.  Computer Frontiers was and remains a Woman-Owned Small Business, certified by the Small Business Administration.

28.     Throughout the process of securing the GSS Prime Contract, Defendants relied heavily upon the purported Mentor-Protégé relationship with Computer Frontiers to gain a competitive advantage over its competitors.

29.     At every stage in the proposal process Computer Frontiers was an integral part of the strategy and was an active part of writing the proposal, with the team relying on CFI's unique experience, qualifications and small business status.  Based largely upon CFI's contributions, Stanley was awarded the contract for Department of State Global Support Strategy for Visa Services (Prime Contract #: SAQMMA1QD0018) ("GSS Prime Contract"), in 2009.

30.     The purpose of the GSS Prime Contract is to assist U. S. embassies and consulates worldwide in providing visa information and support services.  The prime contractor, along with its subcontractor(s), accomplishes this mission by implementing e-government solutions to improve visa processing and issuance services in countries around the world.  While Stanley successfully secured the GSS Prime Contract, work under Task Orders under the Prime Contract was to be awarded based on solutions proposed by the Stanley Team.

31.     Not only have Defendants relied upon their purported Mentor-Protégé relationship with Computer Frontiers; but, a pivotal component of Stanley's ability to secure and

continually operate under the GSS Prime Contract has been the appearance that Defendants are active good-faith participants in the Department of State Mentor-Protégé Program. *See* U. S. Department of State Mentor-Protégé Program, attached as Exhibit 3. This program is an arrangement designed "to encourage subcontracting opportunities for small business concerns," under which a larger company, typically a prime contractor such as Stanley, through an agreement approved by the Department of State, commits to provide technical, managerial and other kinds of assistance to a smaller company in order to assist the Department of State in reaching its congressionally mandated goals. *See* 15 U. S. C. § 637 (d) (4) (E).

32.     The original Mentor-Protégé Agreement was entered into by and between Stanley and Computer Frontiers on April 2, 2010. *See* Mentor-Protégé Agreement, attached as Exhibit 4. Throughout the proposal process, Defendants frequently made specific reference to the parties' relationship under the Department of State Mentor-Protégé Program.

33.     The original Mentor-Protégé Agreement was modified on December 13, 2010 to reflect the acquisition of Stanley Associates Inc. and its subsidiaries by CGI Group on August 17, 2010. *See* Modification to Mentor-Protégé Agreement, attached as Exhibit 5. This acquisition made Stanley Associates, Inc. a wholly owned subsidiary of CGI Federal Inc., known as Stanley, Inc. The December 13, 2010 modification expanded the Mentor-Protégé relationship to include partnerships on both CGI Federal and Stanley Inc. procurement opportunities, to include the relationship with Computer Frontiers. *See* Modification to Mentor-Protégé Agreement, attached as Exhibit 5.

34.     To date, Defendants have failed to satisfy their obligations as a mentor under the Mentor-Protégé Agreement in several regards, including Defendants' wholesale failure to implement a Developmental Assistance Program as detailed by the Department of State, and by consistently and deliberately operating to the detriment of Computer Frontiers, its protégé, with regard to the GSS Prime Contract.

## C.     Securing the Stanley-CFI Subcontract

35.     On February 26, 2010, Computer Frontiers and Stanley entered into a Subcontract Agreement under which Stanley is obligated to provide Computer Frontiers with 9% of the work-share under CGI's GSS Contract (Subcontract Agreement #: SK-901-10-CFI-GSS) (the

"Subcontract"), which Stanley countersigned on March 15, 2010. *See* Subcontract, attached as Exhibit 1.

36.     Specifically, the Subcontract provides: "Stanley hereby agrees to award GSS Task Orders under the Prime Contract to [Computer Frontiers], for work in geographical locations where Subcontract is equipped and qualified to perform the work under such Task Orders, in an amount equal to at least nine (9%) percent of the gross revenues under the Prime Contract." *See* Exhibit 1, at ¶ 1.1(c).

37.     Relying on the contractual relationship created under the Subcontract, Computer Frontiers has foregone other opportunities to perform visa processing services.

38.     The Subcontract does not require Computer Frontiers to have a presence in any geographical area prior to doing any work on a given Task Order.  Indeed, it is common practice to remotely perform much of the services specified in a given Task Order.  For instance, information services include establishment and maintenance of call centers and performance of website maintenance; appointment services include establishment of an online appointment scheduling service; banking services require establishment and maintenance of relationships with local banks.  For services that actually require presence on the ground, local vendors are generally identified to provide those services.  Defendants themselves have adopted this model in many countries.

39.     Under the Teaming Agreement and the Subcontract, Computer Frontiers and Stanley are to work together as partners to devise optimal solutions for every Task Order.  Nothing in the Subcontract positions Computer Frontiers to compete against other vendors with respect to solutions submitted for certain Task Orders.  Rather than bid for work, as a vendor might, Defendants are expected to position Computer Frontiers to offer solutions, as a team member, to perform 9% of the work under Task Orders alongside CGI.

**D.     Actions Under The Subcontract**

40.     Shortly after executing the Subcontract, on or around May 1, 2012, Computer Frontiers and CGI had a meeting in which the parties concluded that CGI would be providing a subcontract modification to clarify the work-share and guarantee CFI's work consistent with the terms of the Subcontract.  The parties agreed that CFI's services would not be limited to

countries in which it currently had a presence as the GSS Prime Contract does not depend upon in-country presence.

41.     Computer Frontiers continued to request modification of the Subcontract to accurately reflect the parties' agreement regarding CFI's services.  This repeated request for a Subcontract modification culminated on June 25, 2012, when Computer Frontiers followed up once more, as it had not yet received the Subcontract modification.

42.     CGI eventually issued a draft of Modification 4 on July 26, 2012.  *See* Draft Modification 4, attached as Exhibit 6.  The proposed modification would have removed the operative clause providing Computer Frontiers with its 9% work-share from the agreement altogether, which was unacceptable to Computer Frontiers.

43.     Stanley claimed that Draft Modification 4 was intended to bring the practices under the Subcontract into conformity with Stanley's practices under other agreements CGI had with other subcontractors where there was no guarantee of work.  However, this position was inconsistent with both the prior contractual interactions between Stanley and Computer Frontiers, and with Stanley's current contractual obligations under the Subcontract.

44.     As just one example, prior to the introduction of Draft Modification 4 to the Subcontract, Computer Frontiers had served as the prime contractor, with CGI as a subcontractor, on a proposal submitted to the U.S.D.A. related to SNAP (Supplemental Nutritional Assistance program), where CGI required and was assured 49% work-share in addition to all work in a specific area.

45.     In another example, prior to the introduction of Draft Modification 4 to the Subcontract, Computer Frontiers had served as the prime contractor, with CGI as a subcontractor, on a proposal submitted to the Department of State relating to Global Monitoring and Evaluation Programs, where CGI demanded and was given all work in a specific category in addition to specific staffing positions and of right of first refusal on other areas.

46.     Although Defendants expressed interest in assigning work to Computer Frontiers, their actions belied that assertion.  Draft Modification 4 would have removed all contractual obligations to provide work-share to Computer Frontiers.  Draft Modification 4 did not overtly extend the Subcontract expiration date, but it suggested possible future work.  The language included in Draft Modification 4 did not provide for participation in future Task Orders (as required to meet the work-share provisions of the Subcontract), but limited CFI's to the ability to

compete on the Task Orders that had already been awarded to Stanley. *See* Draft Modification 4, attached as Exhibit 6.

47.     In fact, the modification that CGI attempted to force on Computer Frontiers would have drastically altered the relationship between the companies – under Draft Modification 4, Computer Frontiers would cease to be a team member as the parties had agreed when they entered into the Subcontract. Draft Modification 4 disregarded the fact that CFI was largely responsible for the award of the Prime Contract to Stanley and not only attempted to change the agreed-upon 9% work-share, it purported to remove any work-share requirement.

48.     When Computer Frontiers refused to "agree" to forego its substantive rights under the Subcontract, Defendants attempted to use extra-contractual means to nonetheless destroy those rights. On September 27, 2013, Defendants attempted to early terminate the only Task Order work that had been awarded to Computer Frontiers under the Subcontract, relegating Computer Frontiers to the role of a competing vendor. In effect, this provided absolutely no work-share for Computer Frontiers as those Task Orders had already been given to other vendors or subcontractors. Had Computer Frontiers executed Stanley's Draft Modification 4, CGI would have successfully stripped Computer Frontiers of any right to work-share altogether.

49.     On January 18, 2013, Computer Frontiers responded to Stanley's Draft Modification 4, suggesting that Computer Frontiers could agree to remove the operative clause in Paragraph 1.1(c) relating to the 9% work share, but only with respect to future Task Orders. However, on March 1, 2013 Stanley refused all of CFI's suggested changes and sent the unaltered Draft Modification 4 back to Computer Frontiers for execution.

50.     Meanwhile, Defendants claimed that the rationale behind modifying the Subcontract through Draft Modification 4 was to enable Stanley to provide more work to Computer Frontiers in Africa by replacing Computer Frontiers with VFS in Nigeria and Ghana. Computer Frontiers soon learned that this was not Stanley's true interest. Despite Computer Frontiers having invested a great deal—at CGI's request—in developing a document delivery solution for Nigeria and Ghana, CGI officials refused to provide the information required to finalize those plans until or unless Computer Frontiers executed CGI's Draft Modification 4. Notwithstanding Stanley's lack of cooperation with CFI's attempts to provide a solution in Nigeria, Computer Frontiers submitted a proposed solution on March 21, 2013. Stanley ignored CFI's input, other than asserting that issues related to the Subcontract should be discussed by the

companies' lawyers. However, on May 30, 2013 Defendants communicated that they were not interested in discussing the Subcontract further. Ultimately, Stanley performed the services in Nigeria itself, excluding Computer Frontiers altogether and subcontracting with German-owned DHL to manage document delivery services. On June 6, 2013 during the weekly operations meeting, CGI's Deputy Program Manager for the GSS Prime Contract announced that the greeter services had been contracted to Adecco International, a Swiss human relations company.

51.     Over time, Defendants continued to develop their practice of excluding Computer Frontiers from work under the GSS Prime Contract, in violation of the terms of the Subcontract Agreement.

52.     Frequently, Defendants would neither consult with Computer Frontiers nor invite Computer Frontiers to participate in the proposal development process for providing solutions under various Task Orders designed to identify partners and work-share.

53.     However, subsequent to securing the GSS Prime Contract, Defendants continued to represent that they were active good-faith participants in the Department of State Mentor-Protégé Program, to their own advantage. *See* U. S. Government Debrief for Task Order 4, attached as Exhibit 8.

54.     Task Order #3 is typical of the manner in which Stanley proposed the services to be provided under the GSS Prime Contract in a manner that required the participation and inclusion of CFI, consistent with the terms of the Subcontract.

55.     In its proposal for Task Order #3, Stanley identified Computer Frontiers as a partner, extolling CFI's credentials and past performance, in order to win the Task order. *See* Task Order 3 Final Proposal, attached as Exhibit 7. Stanley specifically references the Mentor-Protégé relationship with Computer Frontiers: "Stanley has worked to establish formal recognized mentor-protégé relationships and has done this with one of our current team members, Computer-Frontiers, Inc. (CFI), a Small Disadvantaged Business (SDB). Stanley and CFI have a fully executed and accepted DoS Mentor-Protégé Agreement on record with the U. S. Department of State Office of Small and Disadvantaged Business Utilization (dated 18 May 2010)." *Id*. at D3.

56.     Further extolling the qualifications and contributions of Computer Frontiers, in order to secure Task Order #3, Stanley acknowledged: "In addition, Computer-Frontiers, Inc. (CFI), a Small Disadvantaged Business, serves in our [Project Management Office] and

contributes to our solution through IT hardware and software acquisitions." *See* Task Order 3 Final Proposal, attached as Exhibit 7, p. D1-D2.

57.     In the meantime, consistent with the terms of the Subcontract, for many Task Orders, Computer Frontiers worked with vendors that possessed world-class credentials, U. S. ownership, and facilities in multiple geographic locations. Yet CFI's proposals were uniformly rejected as unacceptable without providing Computer Frontiers the opportunity to present supporting evidence countering any supposed weaknesses in the proposal.

58.     Under the Prime Contract, Defendants are able to offer proposals for solutions under various Task Orders. A successful proposal results in additional work under the GSS Prime Contract, which the parties agreed would result in additional work, and therefore revenue, for Computer Frontiers under the Subcontract. Specifically, there are 23 Task Orders, each of which relates to GSS services in different countries and geographic regions worldwide.

59.     Computer Frontiers only had visibility over the first 5 proposals to the government for additional work under the Task Orders. In each of those five, Computer Frontiers participated and helped in the development of the solution, writing parts of the proposal as well as researching and reviewing the proposal at various stages. With the exception of Task Order 4 and Task Order 5, where CFI's call center was proposed in the solution, in all solutions call-center, document delivery and banking were outsourced to vendors managed primarily by VFS.

60.     By the terms of the Subcontract and the parties' Mentor-Protégé Agreement, Stanley would provide guidance and support to assist Computer Frontiers in securing work under the Task Orders. Instead Stanley did the opposite; Stanley deliberately sought out, fabricated, and sometimes attempted to enhance or create weaknesses in the solutions Computer Frontiers submitted to Stanley, apparently in an attempt to excuse Defendants failure to abide by the terms of the Subcontract.

61.     Despite Defendants' ongoing refusal to provide Computer Frontiers with the work-share that was both bargained-for and agreed-upon under the Subcontract, Defendants continue to include Computer Frontiers as a team member and rely heavily on their past performance in proposals submitted for Task Orders under the GSS Prime Contract. *See* U. S. Government Debrief for Task Order 4, attached as Exhibit 8.

62.     Defendants represent that there is an executed U. S. Department of State Mentor-Protégé Agreement between Stanley and Computer Frontiers.  However, Defendants do not abide by the terms of the Mentor-Protégé Agreement.

63.     In attempts to secure work under various Task Orders, Defendants have emphasized a history of establishing Visa and appointment systems for Immigrant Visa and Non-Immigrant Visa services in 9 countries.  These are attributes unique to Computer Frontiers. However, Defendants have not provided CFI's work-share consistent with these attributes.

64.     In attempts to secure work under various Task Orders, Defendants have used CFI's unique status as the only small business recognized by the Department of State as being capable of providing viable GSS solutions.  Yet, Defendants have not provided CFI's work-share consistent with this acknowledged qualification.

65.     In attempts to secure work under various Task Orders, Defendants have acknowledged that Computer Frontiers brings significant experience and past performance providing innovative solutions, implemented in countries with challenging infrastructures. However, Defendants have not provided CFI's work-share consistent with these attributes.

66.     In attempts to secure work under various Task Orders, Defendants have acknowledged that, on separate occasions, Computer Frontiers has established locations in Senegal, South Africa, and Togo within 90 days, on-time, and within budget.  However, Defendants have not provided CFI's work-share consistent with these attributes.

67.     The U. S. Government's Evaluation Criteria for contracts includes consideration of "the extent to which the offeror demonstrates the ability to identify, vet, and select subcontractors and cultivate productive working relationships with reputable U. S. and foreign vendors to accomplish GSS program goals and objectives without compromising the security and integrity of visa applicants, the application process, GSS employees, or the USG." *See, e.g.*, Task Order Request For Proposal, GSS For India, Reference #: GSS-TO-12-11, attached as Exhibit 9, at ¶ 2.6.2.  "The Government will also evaluate information that demonstrates realistic commitments to use SDB concerns relative to the size and complexity of the acquisition under consideration." *Id*.

68.     In Stanley's proposals, Defendants have used (i) the Mentor-Protégé relationship between Stanley and Computer Frontiers, (ii) CFI's past performance and qualifications, and (iii) CFI's status as both a Small Disadvantaged Business and as a Woman Owned Small

Business, because utilization of small businesses had been one of the key factors by which government has decided between competitors in the awarding of contracts.

69.    As a general practice, Stanley lauded its business methods as an "approach to achieving a unified, consistent support model builds on our existing team relationships." *See* Task Order 3 Final Proposal, attached as Exhibit 7, at p. D-3.   Meanwhile, Stanley has consistently operated to the detriment and exclusion of one of its primary "team" members, Computer Frontiers, and has failed to follow its small business subcontracting proposal.

**E.     Excuses Offered For Not Providing CFI Contractual Work-Share**

70.    Defendants have maintained that Computer Frontiers is only qualified to perform services in Africa, where Computer Frontiers had past performance, despite the fact that Computer Frontiers never agreed to such geographic restriction in any of its agreements with Stanley.   Neither VFS nor CGI had physical presence or past performance in all geographical locations where GSS services were to be performed or were proposed to be performed.   Instead, VFS and CGI relied on vendors to fill any geographical gaps (just as Computer Frontiers could have).   Neither Stanley nor VFS had call centers of their own supporting U. S. visa related services prior to the GSS Prime Contract; and neither had offices in many countries where Computer Frontiers was not included in the solutions presented to the government.

71.    Instead of working with Computer Frontiers as a "team member" or mentoring Computer Frontiers, as Defendants repeatedly claimed in proposals, Defendants repeatedly claimed that prices proposed by Computer Frontiers were too high, notwithstanding the fact that CGI was well aware of Computer Frontiers' pricing when it entered into the Subcontract, and the fact that Computer Frontiers expressed a willingness to make appropriate and reasonable price adjustments.

72.    With one exception, the prices that Computer Frontiers proposed were consistently within the price range customary in the industry, and within the general price range that Computer Frontiers communicated to CGI before entering into the Subcontract.   For example, during the entire process of proposal development for one Task Order, Computer Frontiers participated in the standup meetings and solution development.   Yet, Computer Frontiers' proposals were never considered or discussed during the meetings.   Notwithstanding several attempts to correspond with Defendants, Computer Frontiers was disregarded.

73.     In the instance when Computer Frontiers was actually permitted to actively participate in the proposal process and the work-share was directed to VFS instead of Computer Frontiers, VFS's services were severely underpriced, operating at a loss, and Defendants were unable to deliver services on time or meet its service level agreements.

74.     Although Computer Frontiers continuously made itself readily available to work with Defendants to develop appropriate pricing, Defendants positioned Computer Frontiers to compete with vendors who had not contributed in the bidding process for the prime contract, were not U. S. companies or small businesses, and with whom Defendants had no contractual obligation, notwithstanding Defendants' obligation to Computer Frontiers.     Under the Subcontract, Computer Frontiers and Stanley were to work together to devise optimal solutions. Defendants disregarded their obligation and required Computer Frontiers to compete against other vendors.

75.     As Computer Frontiers was being denied opportunities for meaningful participation in the proposal process for Task Orders, VFS was not subject to similar price constraints; Defendants deliberately withheld information within their knowledge regarding the acceptable price range or the factors that affected pricing assumptions such as calls to applicant ratios during various stages of GSS implementation vital information that was available to Stanley as such information was being reported for all countries and task orders; and, Defendants consistently failed to request best and final pricing, with the exception of Task Order 4.  This deprived Computer Frontiers of the opportunity to adjust its pricing to CGI's satisfaction.

76.     Defendants also manipulated Computer Frontiers in presenting solutions with continuous alterations in the scope of work.  For example, with respect to Task Order 10 for India, Defendants verbally communicated an acceptable price range of less than $2.  Computer Frontiers proposed a solution within that price range, with all calls to be handled by Computer Frontiers from India.  Defendants responded by imposing a new and additional requirement that part of the proposal must include calls being made from the U. S.  When Computer Frontiers offered a separate price for U. S.-based calls, Defendants added a new and additional requirement that the hybrid price must be less than $2.00.  Yet recently, Stanley's Associate Vice President & GSS Program Manager, Ramsey Nofal, disclosed that no calls for the India Task Order are handled from the United States.  Mr. Ramsey also attempted to orchestrate a method through which Computer Frontiers would share 50% of calls with VFS and VFS would control

the call routing to Computer Frontiers, Computer Frontiers complied but Computer Frontiers was still excluded from the proposed solution. Finally Computer Frontiers was asked to submit staff based pricing for handling up to 10% of calls originating from US with services to be delivered from the Computer Frontiers Offices in U.S. The last Teaming Agreement and cost proposal sent to CGI for this Task Order included only the solution with 10 full time equivalent employees to handle calls originating from the U. S. Defendant did not sign the Teaming agreement. The solution that CGI had requested from Computer Frontiers was not even included in the Proposal submitted to the government.

77.    Also during the proposal process for Task Order 10 for India, Defendants deliberately thwarted CFI's ability to gain part of its contractually agreed-upon work-share through other means. Specifically, VFS approached Computer Frontiers requesting pricing to have 8-10 Customer Service Representatives in the U. S. VFS actually wanted to include Computer Frontiers in its solution to CGI. Yet, again, through Stanley's Associate Vice President & GSS Program Manager, Ramsey Nofal, Defendants intervened and prevented Computer Frontiers from gaining its contractually agreed-upon work-share. Defendants ultimately took over the call center services work from VFS for this Task order, excluding Computer Frontiers altogether.

78.    Another method Defendants have used to avoid providing Computer Frontiers with its 9% work-share under the Subcontract has been to intentionally withhold historical information related to the weaknesses identified by the government in CGI's past proposals. Some of this information would have been generally applicable to all proposed solutions and some would have been specifically applicable to the Requests for Proposals for particular Task Orders for which the solution was being developed.

79.    In almost all cases where separate teaming agreements were required, the teaming agreement was deliberately presented to Computer Frontiers late, hindering its ability to have the agreement reviewed by its team in a timely manner. In almost all instances, Defendants attempted to get Computer Frontiers to accept a provision stating: "there is no guaranteed work." Under the requirements of the Subcontract, and the Mentor-Protégé agreement, Defendants should have instead clearly articulated the work sought from Computer Frontiers and subsequently guaranteed that work to Computer Frontiers. But, to the contrary, Defendants had no intention of awarding the contractually agreed upon 9% work to Computer Frontiers and

therefore did not execute any of the Teaming Agreements that included requested modifications from Computer Frontiers.

80.     With respect to Task Order 16 for China, Defendants deliberately withheld vital information related to licensing that the U. S. Government required in the RFP.   Then, Defendants used the fact that Computer Frontiers was not aware of the licensing requirements to reject CFI's proposal.   Stanley's Vice President & GSS Program Manager, Ramsey Nofal had known about this requirement all along.   Unbeknownst to Computer Frontiers – but well within the knowledge of Mr. Ramsey Nofal – the U. S. Government had issued an Amendment to the Task Order Request Package, explaining and defining the requirements.   As a "team member," Computer Frontiers customarily asked Stanley to share with them any responses to submitted questions and asked whether any modification had been issued.   In response, rather than providing the requested information, Mr. Ramsey Nofal, would only provide the Table of Contents of the RFP Modification.   Had they been operating in good faith, and as a Mentor, Defendants would have made every effort to provide all possible information that was available to ensure that the solution presented to the government was flawless.   Instead, Defendants deliberately withheld from Computer Frontiers the RFP in its entirety, thereby intentionally eviscerating CFI's ability to gain its contractually agreed-upon work-share.   As a result, Defendants are providing the call center solution in China themselves, thereby enhancing their own profits at the expense of CFI's contractually mandated work-share.

81.     Even as Defendants deliberately withheld vital information related to licensing, they continued to pressure Computer Frontiers to sign a Teaming Agreement that removed the previously agreed-upon 9% work-share.

82.     With respect to nearly every Task Order, each Teaming Agreement was provided to Computer Frontiers with a limited number of days remaining before the Proposal submission date. The Teaming Agreements consistently contained language that had never been acceptable to Computer Frontiers.   However, Defendants continuously sought agreement from Computer Frontiers that Computer Frontiers would not be entitled to its 9% work-share under the Subcontract.

F.    **Stepped-Up Pricing**

83.    Even when Defendants appeared to observe their contractual obligations, they engaged in deceptive practices to avoid paying Computer Frontiers the entire amount that Computer Frontiers was due based on stepped-up volume pricing.

84.    The price model for services under the GSS Prime Contract is based on the number of applicants who submit an application and pay the visa processing fee. For all GSS Task Orders, the Request for Proposal includes the approximate number of applicants who will apply for visas. This number is the Base Volume. The Government guarantees a minimum payment to the contractor for the base volume of applicants. To determine the Base Price, the Base Volume is multiplied by the Applicant Price. If, during any given year of service, the actual number of applicants exceeds the Base Volume, then the Government reimburses the contractor using the stepped-up pricing schedule that was submitted as part of the proposal.

85.    For Task Order 4, in which Computer Frontiers was involved, Computer Frontiers collaborated with CGI to prepare the pricing model. *See* GSS Task Order 4 Pricing Model, attached as Exhibit 10. Computer Frontiers used a spreadsheet provided by CGI, which included pricing both for the Base Volume of applicants and the stepped-up pricing schedule. Defendants included CFI's submitted price plus their own markup for the "information services" in the overall Price that was submitted to and accepted by the Government when Task Order 4 was awarded.

86.    When Task Order 4 information services work was being assigned to Computer Frontiers, Stanley wanted to perform the website development work themselves and Computer Frontiers provided a discount by adjusting the startup costs. Stanley's subcontracts manager presented the Task Order agreement to Computer Frontiers, which identified the contract as a Firm Fixed Price ("FFP") contract and set the amounts corresponding to the Base Volumes for the subsequent 5 years. Computer Frontiers requested inclusion of language representing both the price for Base Volume and the price for volumes exceeding the Base Volume. Stanley responded in writing that the Task Order was FFP for the Base Volume and that for any appointment exceeding the Base Volume, Stanley would request an economic price adjustment and modify Stanley's Purchase Order and Task Order Value accordingly. *See* Stanley-CFI Correspondence, attached as Exhibit 11.

87.     The Task Order documents were modified to reflect the fact that the amounts prices listed were for Base Volume only.  However, when presented with an invoice for the applicant volumes exceeding Base Volume, CGI responded by denying that it had agreed to stepped-up pricing.  Computer Frontiers has repeatedly asked Defendants to discuss proper invoicing procedures for appointments over Base Volume, and Defendants have ignored CFI's repeated requests.   Notwithstanding Defendants' refusal to permit Computer Frontiers to properly invoice amounts received in excess of Base Volume, CGI has been receiving these payments from the Government every year on behalf of Computer Frontiers, along with their marked up management Fee.

88.     Notwithstanding the parties' agreement that "[e]ach party owes to the other a duty of good faith and fair dealing in the performance of its obligations under the Subcontract," *see* Subcontract, Attached as Exhibit 1, at ¶¶ 1.33, Defendants have not operated in good faith in ensuring that Computer Frontiers has work under Task Orders, "in an amount equal to at least nine percent (9%) of the gross revenues under the [GSS] Prime Contract." *See id.* at ¶¶ 1.1(c).

89.     After securing the GSS Prime Contract and entering into the Subcontract with Computer Frontiers, Defendants submitted a proposal for the Canada Task Order without the benefit of CFI's participation, and were unsuccessful.  Subsequently, Defendants submitted a proposal for the Philippines, Indonesia, Malaysia, Singapore (PIMS) Task Order, without the benefit of CFI's participation; and, underbid with the assistance of VFS.  Although Defendants were successful, they could not perform, and the State Department's confidence in providing CGI more work diminished.  Subsequently, with the benefit of CFI's participation, Defendants submitted a proposal for the English Speaking West Africa (ESWA) Task Order. Although that proposal succeeded, with the benefit of CFI's assistance, CGI ultimately only permitted Computer Frontiers to provide the processes and the call center.  The implementation of this Task Order was less troubled.  While Computer Frontiers expected Defendants to begin to abide by the terms of the subcontract at this point, Defendants continue to disregard their contractual commitments to Computer Frontiers.

90.     Computer Frontiers, a key subcontractor, contributed significantly to the award of the GSS Prime Contract to Defendants.  *See* U. S. Government Debrief for Task Order 4, attached as Exhibit 8.  Computer Frontiers has significant experience and past performance providing visa services on behalf of the U. S. Government.  To its advantage, Defendants have

used the experience of Computer Frontiers, its status as both a Small Disadvantaged Business and a Woman Owned Small Business, and the appearance of a genuine Mentor-Protégé relationship between Stanley and Computer Frontiers. And, the parties bargained for and agreed to a reasonable work-share of 9% for Computer Frontiers. Yet, CGI's conduct indicates that it never intended to provide Computer Frontiers with the agreed-upon work-share. Computer Frontiers now seeks the agreed-upon and bargained for work-share and all contractual entitlements thereto.

## CLAIMS FOR RELIEF

### COUNT I:
Breach of Contract

91.     Computer Frontiers repeats and realleges the allegations of paragraphs 1 through 90 as though fully set forth herein.

92.     On February 26, 2010, Computer Frontiers, Inc. entered into the Subcontract Agreement with Stanley Associates, Inc. for work to be done under the GSS Prime Contract.

93.     Stanley Associates, Inc. and its subsidiaries were subsequently acquired by CGI Group Inc.; and, Stanley Associates, Inc. is now a wholly-owned subsidiary of CGI Federal Inc., called Stanley, Inc.

94.     The parties to the contract agreed that Computer Frontiers would be awarded GSS Task Orders for work "in an amount equal to at least nine percent (9%) of the gross revenues under the Prime Contract." *See* Exhibit 1, at ¶ 1.1(c).

95.     Since entering into the Subcontract with Stanley, Computer Frontiers has been equipped and qualified to perform its contractually agreed upon work-share under the GSS Prime Contract's Task Orders.

96.     Computer Frontiers, Inc. has satisfied all conditions precedent under the Subcontract.

97.     Notwithstanding the parties' agreement that "[e]ach party owes to the other a duty of good faith and fair dealing in the performance of its obligations under the Subcontract," *see* Exhibit 1, at ¶¶ 1.33, Defendants have not operated in good faith in ensuring that Computer Frontiers has work under Task Orders, "in an amount equal to at least nine percent (9%) of the gross revenues under the [GSS] Prime Contract." *See id.* at ¶¶ 1.1(c).

98.     Defendants' deliberate withholding of information relevant to the generation of viable solutions under the Task Orders has deprived Computer Frontiers of its contractually agreed-upon work-share.

99.     Moreover, by deliberately interfering with CFI's ability to perform its work under the Task Orders, Defendants have violated the implied covenant of good faith and fair dealing.

100.    Defendants' positioning of Computer Frontiers as a vendor required to compete with other vendors for work-share is in violation of the terms of the Subcontract, which entitle Computer Frontiers to 9% of gross revenues under the GSS Prime Contract.

101.    Defendants' violation of the parties' Department of State Mentor-Protégé agreement is both inconsistent with its representations to the U. S. Government in Task Order Proposals and a material breach of the Subcontract agreement.

102.    Defendants materially breached the Subcontract by failing to award work under the GSS Task Orders, in an amount equal to at least nine percent (9%) of the gross revenues under the GSS Prime Contract.

103.    With respect to Task Order #4, under which Computer Frontiers has performed work under the GSS Prime Contract, Defendants have not paid the amounts invoiced. The deficiency in Defendant's payments total $792,170.15.

104.    Defendants materially breached the Subcontract by failing to pay for work performed under the terms of the Subcontract in an amount that totals $792,170.15.

105.    Computer Frontiers has been damaged by Defendants' material breaches of contract in the amount of at least nine percent (9%) of the gross revenue awarded under the Prime Contract, which totals $14,813,473.55.

106.    The GSS Prime Contract is a ten-year vehicle with a maximum value of approximately $2.8 billion.

107.    To date, Defendants have received Task Order awards in the amount of approximately $146,990,369.46 under the GSS Prime Contract, leaving the remaining value at as much as $2.65 billion.

108.    Computer Frontiers bargained for and agreed that Computer Frontiers would receive work-share in an amount equal to at least nine (9%) percent of the gross revenues under the Prime Contract—or $238 million, should CGI receive the entire $2.65 billion remaining value of the Prime Contract.

109. If Defendants continue to deny Computer Frontiers its contracted-for nine percent of all work-share under the GSS Prime Contract, Computer Frontiers will continue to be damaged in an amount that is not currently calculable, but is approximately $238 million.

WHEREFORE, Computer Frontiers, Inc., moves for judgment against Defendants for the sum of at least $14,813,473.55, plus any additional amounts proven at trial up to approximately $238 million, plus interest thereon, and its costs expended in this action; and further moves for an Order that CGI specifically perform all of its obligations under the Subcontract, including without limitation, all of the obligations under Paragraph 1.1 (c) of the Subcontract, commencing as of the date of this Complaint.

## COUNT II
Fraud

110. Computer Frontiers repeats and realleges the allegations of paragraphs 1 through 109 as though fully set forth herein.

111. Stanley represented to Computer Frontiers that it would award GSS Task Orders under the Prime Contract to Computer Frontiers in an amount equal to at least nine percent (9%) of the gross revenues under the GSS Prime Contract.

112. Defendants represented to Computer Frontiers that it would actively participate in the Department of State Mentor-Protégé Program, and executed an agreement with Computer Frontiers to that effect.

113. Defendants have failed to satisfy their obligations as a mentor under the Mentor-Protégé agreement in several regards, including their wholesale failure to implement a Developmental Assistance Program as detailed by the Department of State, and by consistently and deliberately operating to the detriment of Computer Frontiers, Defendants' protégé, with regard to the GSS Prime Contract.

114. Defendants and Computer Frontiers agreed that "[e]ach party owes to the other a duty of good faith and fair dealing in the performance of its obligations under the Subcontract," *see* Subcontract, Attached as Exhibit 1, at ¶¶ 1.33.

115. Computer Frontiers reasonably relied on those representations and provided Defendants with solutions requisite for awards of GSS Task Orders under the Prime Contract, commensurate with the information that Defendants provided to Computer Frontiers.

116. Stanley's representation that it would, upon award of Task Orders, provide Computer Frontiers with work under those Task Orders, were false when made. Stanley made those representations with the intention of (i) using CFI's expertise and status as a Small Disadvantaged Business and Woman Owned Small Business, (ii) increasing its value prior to its acquisition by CGI Group Inc., and (iii) securing the GSS Prime Contract and Task Orders under the GSS Prime Contract.

117. Defendants did not intend to award 9% of the gross revenues under the GSS Prime Contract to Computer Frontiers as a team member, but intended to create a competitive environment among vendors such that Defendants could award work to other subcontractors and retain a greater percentage of the gross revenues under the GSS Prime Contract.

118. Defendants have asserted false statements of fact, fraudulently induced Computer Frontiers to assist in securing work under GSS Task Orders, refused to permit Computer Frontiers to participate in the proposal process for Task Orders, otherwise hindered CFI's ability to successfully acquire its 9% work-share, and offered terms through Modifications and Teaming Agreements that it knew Computer Frontiers would not agree to as part of its scheme to use Computer Frontiers, its expertise, and its small business status to securing the GSS Prime Contract and Task Orders under the GSS Prime Contract.

119. Defendants' misrepresentations related to material matters.

120. These representations concerned existing material facts.

121. These representations were false.

122. Defendants' misrepresentations and wholesale denial of work-share were intended to mislead Computer Frontiers and to induce Computer Frontiers to participate in the process of securing the GSS Prime Contract and Task Orders under the GSS Prime Contract and then to cut Computer Frontiers out of the revenues under the GSS Prime Contract.

123. Defendants' actions have been taken willfully, maliciously, and intentionally.

124. The GSS Prime Contract is a ten-year vehicle with a maximum value of approximately $2.8 billion.

125. To date, Defendants have received Task Order awards in the amount of approximately $146,990,369.46 under the GSS Prime Contract, leaving the remaining value at as much as $2.65 billion.

126.    Computer Frontiers bargained for and agreed that Computer Frontiers would receive work-share in an amount equal to at least nine (9%) percent of the gross revenues under the Prime Contract—or $238 million, should CGI receive the entire $2.65 billion remaining value of the Prime Contract.

127.    If Defendants continue to engage in their ongoing fraudulent activities and thereby continue to deny Computer Frontiers its contracted-for nine percent of all work-share under the GSS Prime Contract, Computer Frontiers will continue to be damaged in an amount that is not currently calculable, but is approximately $238 million.

128.    Computer Frontiers is entitled to be paid by Defendants for at least $714 million in punitive damages because of Defendants' having committed fraud against Computer Frontiers.

WHEREFORE, Computer Frontiers, Inc., moves for judgment against Defendants for the sum of at least $44,440,420.65, plus additional amounts proven at trial up to approximately $714 million, plus its attorneys' fees and interest thereon, and its costs expended in this action.

## COUNT III
### Unjust Enrichment

129.    Computer Frontiers repeats and realleges the allegations of paragraphs 1 through 128 as though fully set forth herein.

130.    Computer Frontiers conferred a benefit when it introduced Stanley to the GSS Prime Contract opportunity, provided Stanley with the wherewithal to actively participate in the procurement process, and provided the benefit of a necessary Small Business based on its qualifications as a Small Disadvantaged Business and Woman Owned Small Business.

131.    Stanley knew that it could not acquire the GSS Prime Contract on its own and that it needed the requisite qualifications, experience, expertise, and Small Business status of Computer Frontiers.

132.    CFI's efforts conferred a benefit on Stanley.

133.    Stanley accepted or retained the benefit of CFI's experience and expertise, and its contributions to the proposal process without paying for its value.   CFI's acceptance and retention of those benefits without payment is inequitable.

WHEREFORE, Computer Frontiers, Inc., moves for judgment against Defendants for the sum of at least $14,813,473.55, plus its attorneys' fees and interest thereon, and its costs expended in this action.

## REQUEST FOR RELIEF

WHEREFORE, Computer Frontiers respectfully requests that the Court enter judgment in its favor and against CGI, and:

(1)    Order that CGI specifically perform all of its obligations under the Subcontract, including without limitation, all of the obligations under Paragraph 1.1 (c) of the Subcontract, commencing as of the date of this Complaint;

(2)    Award Computer Frontiers its damages, including punitive damages, in an amount to be proven at trial;

(3)    Award Computer Frontiers its attorneys' fees and costs as provided under the Subcontract;

(4)    Order such other relief as this Court deems just and proper.


Respectfully submitted,
Fluet, Huber + Hoang, PLLC

Date: October 23, 2013                    By: _____

Thomas M. Craig, VSB# 68063
Katherine A. Straw, VSB# 82692
Fluet, Huber + Hoang, PLLC
1660 Duke Street, Suite #201
Alexandria, Virginia 22314
tcraig@fluetlaw.com
kstraw@fluetlaw.com
Telephone:  (703) 590-1234
Facsimile:  (703) 590-0366


*Attorneys for Plaintiff*
COMPUTER FRONTIERS, INC.